## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ARNOLD KLEIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. ) |
| MONOGRAM RESIDENTIAL TRUST, INC., MARK T. ALFIERI, E. ALAN PATTON, W. BENJAMIN MORELAND, TAMMY K. JONES, DAVID D. FITCH, JONATHAN L. KEMPNER, and TIMOTHY J. PIRE, | ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) |

Plaintiff Arnold Klein ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Monogram Residential Trust, Inc. ("Monogram" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Monogram, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100 in connection with the proposed merger (the "Proposed Merger") between Monogram and affiliates of Greystar Real Estate Partners ("Greystar").

2.      On July 4, 2017, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $12.00 in cash for each share of Monogram stock they own (the "Merger Consideration"),

representing $3.0 billion in total value.

3.      On July 28, 2017, in order to convince Monogram shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Preliminary Proxy Statement on a Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.   The materially incomplete and misleading Proxy independently violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company that were relied upon by the Board in recommending the Company's shareholders vote in favor of the merger.  The financial projections were also utilized by Monogram's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") in conducting the valuation analyses that support its fairness opinion.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming stockholder vote in order to allow the Company's stockholders to make an informed decision regarding the Proposed Merger.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants'

violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the stockholders vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to Monogram stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; and (ii) Monogram maintains its principal executive offices in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a holder of Monogram common stock.

12.      Defendant Monogram is incorporated in Maryland and maintains its principal executive offices at 5800 Granite Parkway, Suite 1000, Plano, Texas 75024.  The Company's common stock trades on the NYSE under the ticker symbol "MORE."

13.    Individual Defendant Mark T. Alfieri ("Alfieri") has served as a director of the Company since 2014.

14.    Individual Defendant E. Alan Patton ("Patton") has served as a director of the Company since 2013.

15.    Individual Defendant David D. Fitch ("Fitch") has served as a director of the Company since 2014.

16.    Individual Defendant Tammy K. Jones ("Jones") has served as a director of the Company since 2016.

17.    Individual Defendant Jonathan L. Kempner ("Kempner") has served as a director of the Company since 2008.

18.    Individual Defendant W. Benjamin Moreland ("Moreland") has served as a director of the Company since 2016.

19.    Individual Defendant Timothy J. Pire ("Pire") has served as a director of the Company since 2016.

20.    The Board and Monogram may collectively be referred to as the "Defendants." Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Monogram (the "Class"). Excluded from the Class are

Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

22.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of July 26, 2017, there were approximately 167,027,578 shares of Monogram common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Monogram will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the

Proposed Merger based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.     The Proposed Merger

23.     Monogram is a self-managed real estate investment trust (REIT).  The Company invests in, develops and operates multifamily communities offering location and lifestyle amenities.  The Company also invests in stabilized operating communities and communities in various phases of development, with a focus on communities in select markets across the United States.  These include luxury high-rise, mid-rise and garden style multifamily communities.  As of

December 31, 2016, Monogram's portfolio includes investments in 51 multifamily communities in 10 states comprising 14,473 residential units.  The Company's target communities include existing core properties, which it defines as properties that are already stabilized and producing rental income, as well as properties in various phases of development, redevelopment, lease up or repositioning with the intent to transition those properties to core properties.[1]

24.     On July 4, 2017, Monogram issued a press release announcing the Proposed Merger, which states in pertinent part:

> Plano, Texas – July 4, 2017 – Monogram Residential Trust, Inc. (NYSE:MORE), an owner, operator and developer of luxury apartment communities with a significant presence in select coastal markets, today announced that it has entered into a definitive merger agreement to be acquired by a newly formed perpetual life fund, Greystar Growth and Income Fund, LP, led by Greystar Real Estate Partners and its initial founding capital partners, affiliates of APG Asset Management N.V., GIC, and Ivanhoé Cambridge, in a transaction valued at approximately $3.0 billion, including debt to be assumed or refinanced.
>
> Under the terms of the merger agreement, which was unanimously approved by Monogram's Board of Directors, Monogram's stockholders will receive $12.00 per share in cash. This represents a premium of approximately 22% to Monogram's unaffected closing stock price on July 3, 2017, the last trading day prior to the public announcement of the transaction.
>
> The $3.0 billion aggregate transaction value includes Monogram's share of its two institutional co-investment joint ventures with PGGM and NPS. The PGGM joint venture will be restructured, and the joint venture interests held by NPS will be purchased by Greystar pursuant to a separate assignable purchase and sale agreement for approximately $0.5 billion, subject to certain adjustments at closing, including payment of the NPS joint venture's share of debt to be assumed or refinanced in connection with the transaction.
>
> "We are pleased to have reached this agreement, which maximizes value at a substantial premium to our existing share price," said Alan Patton, Monogram's Chairman of the Board of Directors. "We are confident that today's announcement represents the best path forward for all of Monogram's stockholders."
>
> "This landmark is the result of Monogram's success at executing and delivering on strong operations, innovative development programs and investment strategies in

---

[1]     http://www.reuters.com/finance/stocks/companyProfile?symbol=MORE.N.

conjunction with skillful market timing," said Mark Alfieri, Monogram's Chief Executive Officer, President and Chief Operating Officer. "The interest we received from this sophisticated group of investors demonstrates that our targeted focus on building our portfolio with high quality Class A assets in select core markets has been recognized and our stockholders and joint venture partners are rewarded with this successful outcome."

"We are excited to add Monogram's high quality assets in some of the best markets in the country as the seed portfolio for Greystar Growth and Income Fund, LP, our flagship core-plus perpetual life vehicle," said Bob Faith, the Founder, Chairman and Chief Executive Officer of Greystar. "The collective strength and experience of our high-quality investment partners are second to none, and we look forward to completing this transaction and further expanding Greystar's U.S. multifamily platform."

25.    The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.  For instance, Monogram's revenues increased by more than 15% from 2015 to 2016, and the Company has reported sales growth rates of 17.92% in the last year and 34.7% over the last five years.  Notably, Monogram's five-year sales growth rate of 34.7% dwarfs the sales growth rates during that same period for both the industry and sector in which it operates, reported as 6.33% and 13.90%, respectively.

26.    The Company's CEO, Individual Defendant Alfieri, was also optimistic about Monogram's future performance and reported on May 9, 2017: "We are pleased with our first quarter results, including net income of $76.0 million as well as a 12.2% increase in total proportionate portfolio NOI over the prior year quarter.  Our results reflect the continued execution of our development program, which we believe will continue to contribute meaningful value to our high-quality portfolio.  As we head into the peak summer leasing season, we expect that our leasing velocity will accelerate, resulting in occupancy gains, despite significant new supply in our core coastal markets given the ongoing strength of rental demand… Year to date, we have executed on the strategic disposition of three properties totaling $247 million, including our exit from the

Orlando market, and acquired $248 million of high quality assets located in two of our existing coastal markets. It is our continuing belief that we can opportunistically harvest gains through selective dispositions and reallocate the capital in investments that should improve our long-term growth in AFFO and NAV per share."

27.    In sum, it appears that Monogram is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

**II.    The Materially Incomplete and Misleading Proxy**

28.    On July 28, 2017, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

29.    The Proxy fails to provide material information concerning the Company's financial projections, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger. Proxy, 33. The financial projections were also relied upon by the Company's financial advisor, Morgan Stanley, in rendering its fairness opinion. Proxy, 36.

30.     Specifically, the Proxy provides values for non-GAAP (generally accepted accounting principles) financial metrics EBITDA, Core Funds from Operations ("Core FFO"), Adjusted Core Funds from Operations ("AFFO"), and unlevered free cash flows ("UFCF"), but fails to provide (i) the line item projections detailed below for the metrics used to calculate these non-GAAP measures, or (ii) a reconciliation of the non-GAAP projections to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

31.     First, the Proxy defines EBITDA as earnings before interest, taxes, depreciation and amortization and non-recurring items yet fails to provide the values of the underlying line items: (i) interest, (ii) depreciation and amortization, and (iii) non-recurring items. Proxy, 49.

32.     Second, the Proxy defines Core FFO as FFO adjusted for loss on early extinguishment of debt, start up and pursuit expenses, fair value adjustments and non-recurring expenses.  However, the Proxy fails to disclose the values of the underlying line items: (i) early extinguishment of debt, (ii) start up and pursuit expenses, (iii) fair value adjustments and (iv) non-recurring expenses.  Proxy, 49-50.

33.     Third, the Proxy defines AFFO as Core FFO adjusted for recurring capital expenditures, straight-line rents and stock compensation expense, yet fails to provide the values of the underlying line items: (i) recurring capital expenditures, (ii) straight-line rents, and (iii) stock compensation expense.  Proxy, 49-50.

34.     Finally, the Proxy defines UFCF as EBITDA less capital expenditures, acquisition costs (net of dispositions) and development costs, yet fails to provide the value of the underlying line items capital expenditures.  Proxy, 49-50.

35.     When a company discloses non-GAAP financial measures in a Proxy, the Company must also disclose all projections and information necessary to make the non-GAAP measures not

misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

36.     Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Monogram included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

37.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[3]

---

[2]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[3]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into*

Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[4]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

38.    In order to make the projections for Monogram included on pages 49 and 50 of the Proxy materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

39.    At the very least, the Company must disclose the line item projections for the financial metrics that were used to calculated the aforementioned non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.  Indeed, the Defendants acknowledge the misleading nature of non-GAAP projections as Monogram stockholders are cautioned that "[n]on-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information prepared in accordance with GAAP. Monogram's calculation of non-GAAP financial measures may differ from others in its industry and NOI, EBITDA, Core FFO and AFFO are not necessarily comparable with similar titles used by other companies."  Proxy, 49.

---

*Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[4]    *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/ nongaapinterp.htm.

40.     Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor the Proposed Merger was based, in part on the following:

- [The] Board of directors' knowledge of the business, operations, financial condition, earnings and prospects of the company, as well as its knowledge of the current and prospective environment in which the company operates, including economic and market conditions[.]

Proxy, 33.

41.     Moreover, the financial projections at issue were relied upon by the Company's financial advisor, Morgan Stanley, in connection with its valuation analyses.  Proxy, 36.  The opacity concerning the Company's internal projections renders the information set forth on pages 49 and 50 of the Proxy materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a proxy discloses internal projections relied upon by the board, those projections must be complete and accurate.

42.     Specifically, with respect to Morgan Stanley's Discounted Cash Flow Analysis ("DCF"), the Proxy states that Morgan Stanley utilized the non-GAAP metric of UFCF when conducting its DCF Analysis and the resultant implied per share equity value reference range. Proxy, 41-42.  However, the Proxy fails to disclose the underlying line items or reconcile UFCF to its most comparable GAAP equivalent.  The absence of this information renders Morgan Stanley's DCF Analysis incomplete and misleading.

43.     These key inputs are material to Monogram shareholders, and their omission renders the summaries of Morgan Stanley's DCF valuation analysis incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then

makes several key choices "each of which can significantly affect the final valuation." Steven M.

Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the

appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can
> markedly affect the discounted cash flow value… The substantial discretion and
> lack of guidelines and standards also makes the process vulnerable to manipulation
> to arrive at the "right" answer for fairness. This raises a further dilemma in light of
> the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

44.    Lastly, the Proxy states that the Company entered into confidentiality agreements

with Party A, Party B, Party D and Greystar between August 2016 and April 2017, which "included

customary non-disclosure provisions and a standstill provision." Proxy, 26-29. Descriptions

concerning the material terms of these confidentiality agreements, however, are absent from the

Proxy. Notably, the Proxy fails to make uniform disclosures regarding the individual

confidentiality agreements with the various parties. Among other things, the Proxy fails to disclose

whether the standstill provisions had sunset provisions, causing the standstill provisions to fall

away upon entering into a definitive merger agreement.

45.    Further, with respect to Party A, the Proxy provides no detail regarding the

standstill provision in the confidentiality agreement, beyond its existence. As the Proxy does

disclose additional information regarding the standstill provisions in the other parties'

confidentiality agreements, the omission of specific details regarding the confidentiality agreement

with Party A further renders the Proxy materially incomplete and misleading. The omission of

this information leaves shareholders guessing whether a superior offer is precluded from the

Company's consideration.

46.    In sum, the Proxy independently violates both (i) Regulation G, which requires a

presentation and reconciliation of any non-GAAP financial to their most directly comparable

GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Merger from Monogram shareholders. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

**COUNT I**
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act**
**and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder)**

47.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

49.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that,

taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

50.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

51.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the financial projections for the Company; and (ii) the valuation analyses performed by Morgan Stanley in support of its fairness opinion.

52.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were

therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

53.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

54.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

55.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

56.     Monogram is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

57.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

omissions are not corrected prior to the vote on the Proposed Merger.

58.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

59.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.    The Individual Defendants acted as controlling persons of Monogram within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Monogram, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

- 18 -

violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the Proxy.

63.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

66.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding

with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 4, 2017

                                        Respectfully submitted,

                                        **LEVI & KORSINSKY, LLP**

**OF COUNSEL:**
                                        By: */s/ Donald J. Enright*
                                        Donald J. Enright (Bar No. 13551)
**FARUQI & FARUQI, LLP**                1101 30th Street, N.W., Suite 115
Nadeem Faruqi                           Washington, DC 20007
James M. Wilson, Jr.                    Telephone: (202) 524-4290
685 Third Ave., 26th Fl.                Email: denright@zlk.com
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com            *Counsel for Plaintiff*
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*